EVANS v. UNION PAC. RY. CO. et al.

(Circuit Court, D. Colorado. December 1, 1893.)

No. 3,001.

1. EQUITY JURISDICTION—ENFORCEMENT OF CONTRACTS—MATTERS OF POLICY—RAILROAD COMPANIES.

In a contract of alliance between two railroad companies, a provision that one of the roads "shall at all times be operated in its own interest" is a matter of policy and administration, which equity has no jurisdiction to enforce.

2. SAME.

Provisions, however, that the companies shall erect shops in a given city, and that one company shall maintain an independent organization, with its headquarters in a city named, are matters of judicial cognizance.

3. SAME—EQUITY RULE 94—REMOVED CASES.

Equity rule 94, requiring certain allegations in a suit by a shareholder to enforce rights which the corporation itself might properly assert, has no technical force in cases removed from the state courts; and the question is whether the state court had jurisdiction, and whether the federal court has the same jurisdiction in succession thereto. And the shareholder may prosecute the suit if it appears anywhere in the entire record that the corporation will not enforce its rights.

4. RAILROAD COMPANIES—RECEIVERS—ALLIED LINES.
    Upon the insolvency of a controlling railroad company, the allied companies must look to themselves, and if they have been carried into the hands of receivers, along with the parent company, they should have receivers of their own appointed.

In Equity. Bill by John Evans, a stockholder in the Union Pacific, Denver & Gulf Railroad Company, against said company, the Union Pacific Railway Company, and others, for the appointment of a receiver, and other relief.

E. T. Wells, M. F. Taylor, C. J. Hughes, Jr., and R. W. Bonynge, for complainant.

Teller, Orahood & Morgan and J. M. Thurston, for respondents.

HALLETT, District Judge. In the early part of the year 1890, 13 railroad corporations were combined in one, which was called the Union Pacific, Denver & Gulf Railway Company. Seven of these corporations owned lines of road lying north and west of Denver, of the aggregate length of 505 miles. These corporations, and the roads owned by them, were then, and for a considerable time before, in the control of the Union Pacific Railway Company. Six of the corporations so combined owned lines of road lying south of Denver, which formed a continuous line between that place and Ft. Worth, in the state of Texas, with several short branch roads to points near the main line. These corporations were under one management, and bore the common name of the Denver, Texas & Ft. Worth Railroad Company. In connection with other roads extending from Ft. Worth to Galveston, and with a steamship line between Galveston and New York, this line of road was in competition with the Union Pacific Railway Company in the transportation of freight and passengers between the Atlantic seaboard and Colorado points. Complainant in this bill was a stockholder in one or more or all of the companies from which the Ft. Worth Company was made up, and in virtue of that ownership he became a stockholder in the Gulf Company, which, as before stated, was made up of the 13 companies. The purpose of combining all the companies in one is very fully stated in an agreement between the Union Pacific Railway Company and the Gulf Company, which was drawn about the time of the articles of amalgamation. Indeed, it seems that the agreement was the chief consideration between the parties, and that the amalgamation of the companies was regarded as a means only to the end stated therein. The agreement recites the views of the parties in the following language:

"Whereas, the operation of the said Union Pacific, Denver & Gulf Railway Company in harmony with the roads of the Union Pacific Railway Company will be beneficial to each; and whereas, the parties hereto, for their mutual advantage, have agreed to an arrangement for the interchange of business and traffic, and for the carrying of the same over their respective railroads, and have agreed upon a division of the earnings from said traffic, as hereinafter set forth, and provided   *   *   *."

Following these recitals, there are elaborate provisions to the general effect that the roads of both companies shall be operated

as continuous lines, and "in close harmony," and "never in hostility or antagonism" the one to the other, and that they shall not be operated "in the interest of any other line or road to the injury of the roads" of either party.

Much of the bill of complaint is designed to expose a violation of the contract, in respect to a withdrawal of the Ft. Worth Line from the competitive business in which it was engaged at the time the contract was made. It is said that the parties really intended to keep the Ft. Worth road in competition with the Union Pacific for business going to and coming from the Atlantic seaboard, and this is sufficiently expressed in another clause at the end of the contract, to the effect that the road "shall at all times be operated in its own interest." This is a wide field of discussion, which we are not required to enter, since the fulfillment of contracts of this character, involving the general policy of the company and the management of its business, is not within the control of the courts. Oglesby v. Attrill, 105 U. S. 605. Such matters are within the administrative function of the officers of the company, in respect to which the courts cannot interfere.

The agreement to do specific things, as the erection of shops, and to maintain an independent organization and headquarters in the city of Denver, may be referred to another principle of equity jurisprudence. Two paragraphs at the end of the agreement are in the following words:

"And it is also furthermore agreed between the parties hereto that the party of the second part will, in connection with the party of the first part, and the Denver, Leadville and Gunnison Railway Company, erect shops for the joint use of said companies in the city of Denver, the same to cost not less than five hundred thousand ($500,000) dollars. And the parties hereto also further agree that the said Union Pacific, Denver & Gulf Railway Company shall at all times be operated in its own interest, and that it shall maintain an independent organization, with its headquarters in the city of Denver."

As pointed out above, the court has not power or ability to mark the course of wise administration, or to keep the officers of the company within it after it shall have been defined, and therefore the road cannot be "operated in its own interest" through a court of equity. But the other matters mentioned in these paragraphs are proper subjects of judicial inquiry. It is not necessary at present to speak of the shops, as to which there is great controversy, nor to define what is meant by an independent organization of the Gulf Company. It is enough to say that the headquarters of the company have been removed from Denver and from the state of Colorado, and nothing thereof remains within the state. The suggestion that a superintendent in charge of the road as a division of the Union Pacific system may be regarded as holding in his person the headquarters of the company is too absurd for serious discussion; so that it appears clearly enough that some of the subjects mentioned in the agreement and in the bill of complaint are of equitable cognizance, and no doubt arises as to the power and authority of the court in the premises.

Rule 94 of the supreme court[1] has no technical force in a case removed from a state court. In such case the question is whether the state court had jurisdiction, and whether this court has the same jurisdiction in succession to the state court; and, if it is shown anywhere in the entire record that the corporation will not proceed to vindicate its right, a shareholder may be allowed to prosecute the suit. It appears clearly enough in this record that the Gulf Company has passed into the control of the Union Pacific Company, and therefore it is not reasonable to look for any assertion of its right under the contract.

Under ordinary circumstances, the Gulf Company being in possession of its road and managing its affairs, the court would act in the first instance, and probably throughout the proceeding, by injunction, rather than through a receiver. But the Union Pacific Company, having fallen into bankruptcy, has carried this satellite with it into the hands of receivers appointed in other districts, and in this district also, at the instance of its creditors. Upon a condition of insolvency in the parent company, it would seem that allied companies must look out for themselves. The trunk of the tree being dead, the branches must fall. And since it is a question of receivers, in any case, it would seem that the Gulf Company should have its own. Such an appointment will be made at some convenient time after the parties have been heard as to a fit person for the place.

---

[1] Equity Rule 94: "Every bill brought by one or more stockholders in a corporation against the corporation and other parties, founded on rights which may properly be asserted by the corporation, must be verified by oath, and must contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share had devolved on him since by operation of law, and that the suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance. It must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action."